## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| FAIR HOUSING CENTER OF CENTRAL INDIANA, INC., ) ) ) ) | |
| Plaintiff, ) ) | No. _____ |
| v. ) ) | **COMPLAINT** |
| OLD NATIONAL BANK, ) ) | |
| Defendant. ) ) | JURY TRIAL DEMANDED |

**NATURE OF THE ACTION**

1.      Plaintiff the Fair Housing Center of Central Indiana, Inc. ("FHCCI" or "Plaintiff") brings this suit against Old National Bank ("Old National" or "Defendant") pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*, to seek redress for Defendant's pattern or practice of illegal and discriminatory residential mortgage lending. Old National is the largest bank headquartered in Indiana and one of the twenty largest residential mortgage lenders in the Indianapolis region.

2.      Old National has structured its business to avoid providing access to mortgage credit to Black residents and neighborhoods in the Indianapolis area and to discourage Black residents from seeking mortgage credit. Old National deliberately seeks to limit its residential lending business to predominantly white[1] areas and customers and maintains policies and

---

[1] The term "white" is used herein to denote non-Hispanic white individuals.

practices that have the effect of doing so. This conduct constitutes a pattern and practice of redlining and violates the Fair Housing Act.

3.      Of all banks in the country, Old National should be especially attuned to the country's fair lending laws and the need to make loans available in communities of color. In June 2018, Old National announced that it was acquiring Minnesota-based KleinBank. Only the month before, KleinBank entered a settlement agreement with the United States Department of Justice to resolve the government's lawsuit alleging that the bank was engaged in illegal mortgage redlining of majority-minority census tracts. Old National acknowledged that the settlement agreement was binding on it because of the acquisition. Given this very recent history, Old National has no excuse for failing to avoid, detect, and immediately correct the extensive indicia of redlining described herein. The only reasonable response for a bank with a poor record of lending to communities of color and newly subject to a redlining settlement agreement would be to act decisively to address this civil rights issue by making any and all changes necessary to start serving communities of color on an equal basis. It is shocking that Old National did not do this and that its discriminatory practices are instead growing worse.

4.      Those discriminatory practices are reflected in the paucity of loans it makes to Black customers in the Indianapolis area. The Indianapolis-Carmel-Anderson, Indiana Metropolitan Statistical Area ("Indianapolis MSA" or "the MSA") is home to two million people, of whom more than 305,000 are Black. Marion County alone has over 260,000 Black residents.[2] In the two-year period from 2019 to 2020, Old National made over 2,250 mortgage loans in the Indianapolis MSA. The borrower's race was identified in Old National's own data

---

[2] Marion County and the City of Indianapolis are nearly coextensive. Both are fully encompassed by Old National's self-designated Community Reinvestment Act assessment area.

for over 91% of these loans, yet only twenty-three were to Black borrowers in Marion County, and only thirty-seven were to Black borrowers across the entire Indianapolis MSA.

5.      Old National's four closest peer lenders do a much better job of serving Black people in need of mortgage credit. For example, 14.73% of the peers' mortgage loans in Marion County from 2019 to 2020 were made to Black customers.  Only 3.86% of Old National's were to Black customers. This is a nearly four-to-one disparity. The disparities are comparable (1) for the MSA as a whole and for the area within the MSA that Old National has identified as its primary service area or assessment area, (2) when Old National is compared to a larger selection of peers and to all lenders combined, and (3) when looking at applications instead of loan originations. If Defendant's failure to make loans to Black borrowers were due to an absence of qualified borrowers, other lenders in the MSA would have similarly low levels of lending to Black people. But they do not, making Old National a clear and extreme outlier.

6.      Nor can Defendant's poor record of serving Black customers be explained by its product mix. Old National offers federally insured loans under the Federal Housing Administration, Veterans Administration, and Department of Agriculture programs. These programs are designed to meet the needs of low- and moderate-income borrowers who are disproportionately Black. Old National also offers a proprietary first-time homebuyer mortgage called Home Manager, which it touts as being better than Fair Housing Administration loans. Accordingly, Old National has loan products that are well suited to the needs of borrowers across the economic spectrum, including those in underserved Black communities.

7.      Old National's product mix and the much greater success of its peers in making loans to Black customers makes it clear that the reason for Defendant's abysmal lending record is its deliberate avoidance of Black borrowers and neighborhoods, i.e., redlining.

8.      One key way Old National has avoided Black borrowers and neighborhoods is by reducing presence in Indianapolis (where 85% of the MSA's Black residents live) and in Black neighborhoods. In 2010, it had twenty-seven branches in Indianapolis, including six in census tracts that were at least 25% Black. But today, there are just nine branches in the entire city and only two in census tracts that are at least 25% Black, while seventeen of its twenty-one branches in the Indianapolis MSA are in tracts that are less than 10% Black. Likewise, Old National's only Mortgage Loan Officers in Indianapolis are at the same location as its Wealth Management office at the very northern edge of Marion County. They are not located centrally to the city's many Black residents or in either of the two branches in neighborhoods with a sizeable Black population.

9.      Plaintiff the FHCCI met with representatives of Old National in October and November 2019 and highlighted the bank's poor record of serving Black residents and neighborhoods in the Indianapolis area. Old National did not dispute the FHCCI's assessment of its record. It instead told the FHCCI that it was working to improve. The FHCCI encouraged Old National to keep in touch regarding its efforts but did not hear from it again on the subject until June 2021, just one week after Old National had announced its plans to acquire another bank, First Midwest, which would expand its footprint across most of the Midwest including a large presence in the Chicago area. At that point, Old National wanted to avert opposition to its merger application, which required regulatory approval. That application is currently pending.

10.      Despite Old National's acknowledgement of its need for improvement, when the FHCCI and Old National met again in July 2021, its record remained poor. Again, Old National did not dispute the FHCCI's concerns about its lending records and did not engage with the

FHCCI to make improvements. Last month, the FHCCI invited Old National to meet with it and federal regulators regarding the FHCCI's concerns, but Old National did not respond.

11.     Old National's pattern and practice of redlining is further confirmed by in-person testing conducted by the FHCCI. In two separate matched-pair tests conducted in 2021, loan officers from Old National treated Black testers less favorably than similarly situated white testers. Old National gave the Black testers less detailed advice regarding their financial qualifications and the mortgage products that they would qualify for; pushed less favorable products requiring low down payments despite being told that the down payment would be 20%, which makes more favorable products available; and provided less meaningful follow-up contact.

12.     Plaintiff the FHCCI, a nonprofit organization dedicated to fair housing, identified and investigated Defendant's discriminatory and unlawful conduct described herein. Defendant's redlining of the Indianapolis MSA directly contradicts and frustrates the FHCCI's mission of eliminating housing discrimination and creating equal housing opportunities for all. The FHCCI has been forced to divert substantial resources to investigating and counteracting Defendant's conduct, which has prevented it from engaging in other activities in furtherance of its mission.

13.     Plaintiff seeks injunctive relief, declaratory relief, and damages. Absent judicial relief, redlining by Old National will continue and the consequent injury to the FHCCI—and to Black people and neighborhoods in the Indianapolis MSA—will grow. In fact, the injury is likely to grow worse absent relief because Old National is currently seeking regulatory approval to acquire another bank, First Midwest, through a merger—a merger which, if granted, would expand Old National's footprint greatly and put even more communities at risk of redlining. As the FHCCI has informed regulators, the merger application should not be approved by the

Federal Reserve without an enforceable commitment from Old National to significantly improve its lending to communities of color so that it is at least on par with its peers.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 3613.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant conducts business in and is a resident of the district and because a substantial part of the events and omissions giving rise to the claims occurred in the district.

## PARTIES

16.     The Fair Housing Center of Central Indiana, Inc. ("FHCCI" or "Plaintiff") is a private, nonprofit corporation incorporated under the laws of Indiana with its principal place of business at 445 N. Pennsylvania Street, Suite 811, Indianapolis, Indiana, 46204. The FHCCI's mission includes ensuring equal housing opportunities by eliminating housing discrimination, including in Marion County, Indiana, and the greater Indianapolis area. The FHCCI works to eliminate housing discrimination and to ensure equal opportunity for all people through advocacy, education and outreach, investigation of fair housing violations, and enforcement.

17.     Old National is a federally chartered bank that is wholly owned by Old National Bancorp, a bank holding company. Both are headquartered in Evansville, Indiana. Old National has $23.6 billion in assets. Old National Bancorp reported $62.8 million in net income for the second quarter of 2021, $226.4 million in net income for 2020, and $238.2 million in net income for 2019. Upon information and belief, all or nearly all of Old National Bancorp's income comes from its ownership of Defendant Old National Bank. Old National Bancorp is publicly traded on the NASDAQ stock exchange.

18.     Old National is a full-service bank with 166 branches in Indiana, Kentucky, Illinois, Michigan, Wisconsin, and Minnesota. It offers a wide range of products and services for individuals and businesses, including various deposit, loan, trust, and investment management services. Old National has grown dramatically by combining with, through acquisitions by its parent company, nine other banks or thrifts since 2011 and thirty-four since 1990. The combination with First Midwest, which has $21.1 billion in assets, would be Old National's largest yet.

19.     Old National is one of the largest mortgage lenders in the Indianapolis MSA. From 2019-2020, it ranked nineteenth in mortgage applications received and twentieth in mortgages originated in the MSA. That is among all lenders in the country, including the nation's largest banks. Old National ranked second in mortgages originated in the MSA among lenders headquartered in Indiana.

20.     In acting or omitting to act as alleged herein, Old National acted through its employees and/or agents and is liable for the acts and omissions of its employees and/or agents.

21.     In acting or omitting to act as alleged herein, each employee or officer of Old National was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Old National as principal.

## **FACTUAL BACKGROUND**

### A.     **The Demographics of the Indianapolis MSA**

22.     The Indianapolis MSA is comprised of eleven counties: Boone, Brown, Hamilton, Hancock, Hendricks, Johnson, Madison, Marion, Morgan, Putnam, and Shelby. The largest is

Marion, which encompasses the City of Indianapolis and includes nearly half of the MSA's population. Marion County is located at the center of the MSA.

23.     Just over two million people live in the MSA, including approximately 305,000 people who are Black. Nearly 90% of the people who live in the MSA are either white or Black.

24.     The MSA is highly segregated by race. More than 86% (approximately 263,000) of the MSA's Black people live in Marion County.

25.     Outside of Marion County, the MSA is disproportionately white. The combined population of the other ten counties is over 87% white and under 4% Black. All of those counties are at least 83.7% white and no more than 7.8% Black. In Boone, Hancock, and Morgan Counties, every census tract is at least 80% white, and there is only one majority-minority tract in the MSA outside of Marion County.

26.     Marion County itself is also highly segregated, with many census tracts that are at least 80% minority and many that are at least 80% white. Thirty-nine percent of the tracts in Marion County are majority-minority, and most of those are also majority Black.

27.     Old National's assessment area in the Indianapolis MSA is similarly segregated by race. This is the area it has self-designated, pursuant to the federal Community Reinvestment Act and its enabling regulations, as containing the communities it serves.

28.     The assessment area includes seven of the MSA's eleven counties: Boone, Hamilton, Hendricks, Johnson, Madison, Marion, and Putnam. They include over 1.8 million people, including over approximately 302,000 who are Black. Nearly 90% of the Black people in the assessment area live in Marion County; outside of Marion County, the assessment area is 85% white and just 4.5% Black.

29.     The map below illustrates the substantial racial segregation in the Indianapolis MSA and in Old National's assessment area within the MSA.[3]



<hr />

[3] To enhance readability and for the convenience of the Court, large-scale color copies of all maps included herein will be filed with the clerk's office as an appendix to this Complaint.

**B.**      **Old National's Redlining is Especially Egregious and Inexcusable Because It Acquired a Bank Accused by the United States of Redlining in 2018 and It Was Put on Notice by the FHCCI in 2019**

30.     In June 2018, Old National announced plans to acquire Minnesota-based KleinBank.

31.     Less than a year and a half before, the United States Department of Justice filed a redlining lawsuit against KleinBank, alleging that it had "engag[ed] in a pattern or practice of unlawful redlining by structuring its residential mortgage lending business so as to avoid serving the credit needs of neighborhoods where a majority of residents are individuals of racial and ethnic minorities."[4]

32.     KleinBank and the United States settled that lawsuit in May 2018. The settlement agreement required KleinBank to, *inter alia*:

- open a new full-service branch with a full-time on-site residential lending officer in a majority-minority census tract,

- develop partnerships with organizations to establish a presence in majority-minority census tracts,

- conduct advertising, outreach, education, and credit repair initiatives in majority-minority communities, and

- establish a loan subsidy program for residents of majority-minority census tracts.[5]

33.     The following month, Old National publicly announced that it planned to acquire KleinBank. The deal closed later in 2018.

---

[4] Complaint, *United States of Am. v. KleinBank*, No. 17-cv-136 (D. Minn. filed Jan. 13, 2017), at ¶ 1, *available at* https://www.justice.gov/crt/case-document/file/927076/download.
[5] Settlement Agreement Between the United States of Am. & KleinBank (May 8, 2018), *available at* https://www.justice.gov/opa/press-release/file/1060996/download.

34.     Given this history with KleinBank, Old National was or should have been especially attuned to its obligation to serve the credit needs of Black and other minority residents of the communities in which it operates. It also was or should have been especially attuned to the importance of operating brick-and-mortar branches in communities of color, locating mortgage lending officers in branches within communities of color, developing partnerships with community organizations active in communities of color, and conducting outreach and education initiatives in such communities.

35.     Old National was also put on notice in October 2019 that the FHCCI had serious concerns about its low level of mortgage lending in Black communities in the area.

36.     In October 2019, the FHCCI's Executive Director, Amy Nelson, met in person with Old National's Regional CEO Mark Bradford. Ms. Nelson expressed concern that Old National's rate of loan originations to Black borrowers had been dropping in recent years and in 2018 was approximately half the rates of its peers. Mr. Bradford did not dispute these statements.

37.     In November 2019, Mr. Bradford and Ms. Nelson met again, along with three other Old National representatives. Ms. Nelson again expressed concern regarding Old National's poor performance with Black borrowers compared to other lenders. The Old National representatives acknowledged that they needed to improve in this area, and claimed they were trying to do so.

38.     Ms. Nelson advised Old National at the second meeting that the FHCCI would be conducting testing of their lending operations and asked them to keep her informed of efforts to improve Old National's lending to Black borrowers and progress in doing so.

39.     Other than one follow-up email a few weeks later providing flyers for two loan programs that had been discussed at the meeting, the FHCCI received no further communications from Old National regarding this issue until June 2021.

40.     On June 1, 2021, Old National's parent (Old National Bancorp) announced a deal to acquire through merger First Midwest Bancorp, which owns and operates First Midwest Bank, and to combine the two banks under the Old National name, pending regulatory approval. Less than two weeks later, the FHCCI received an email from Old National requesting a meeting. This was the first communication from Old National since late 2019 on this issue.

41.     During that meeting, Ms. Nelson conveyed the FHCCI's deep concern about Old National's continued poor performance in lending to Black borrowers as well as its lack of progress or engagement about that issue. She advised the Old National representatives present that the FHCCI had an open investigation involving the bank because of its low rate of originations to, and applications from, Black borrowers. The Old National representatives acknowledged that the bank's rate of lending to Black borrowers were low in comparison to peers and needed improvement.

42.     Despite having been on notice, Old National had not made appreciable progress toward addressing the FHCCI's redlining concerns, and in fact, its loan performance with Black borrowers in the Indianapolis area has continued to deteriorate.

**C.     Between 2010 and 2021, Old National Closed Many of Its Branches That Served Black Neighborhoods**

43.     Old National has located its branches to serve the mortgage credit needs of white residents and white neighborhoods, and to avoid lending to Black residents and serving neighborhoods with a substantial Black population.

44.     Over the last decade, Old National has disproportionately closed branches located in Black neighborhoods, while maintaining its presence in neighborhoods serving white residents.

45.     In 2010, Old National had fifty-three branches in the Indianapolis MSA and twenty-seven within Marion County. It currently has twenty-one in the MSA, and nine within the County.

46.     Although Old National reduced the overall number of its branches across the region, there has been a disproportionately large decrease in those located in and serving Black neighborhoods.

47.     In 2010, Old National had two branches in census tracts that were more than half Black in the Indianapolis MSA, and six branches in census tracts that were more than a quarter Black, out of a total of fifty-three branches in the MSA. Since 13% of all census tracts in the MSA were more than half Black in 2010, and 26% were more than a quarter Black, this already represented a disproportionately low presence in Black neighborhoods.

48.     The map on the following page shows the location of Old National's full-service branches within the Indianapolis MSA as of 2010. While forty-seven of the bank's fifty-three branches were located in areas with less than 25% Black residents, the map shows that some of them were at least close enough to serve neighborhoods with a significant Black population.

## 2010 Old National Branch Locations



**Legend**



▲ Branch Location

▭ Indianapolis MSA

**Percent Black Population**

◻ 0-25%

◼ 25-50%

◼ 50-80%

◼ 80-100%

49.      Between 2010 and the present, Old National closed many of the branches that had been serving neighborhoods with a higher proportion of Black residents.

50.      The map on the following page shows the Old National branches in Marion County as of 2010. It indicates (with circles) which of those branches were closed between 2010 and 2021. All of the closed branches were located either in or immediately adjacent to a census tract with a 25% or higher proportion of Black residents.

## 2010 Old National Branch Locations



### Legend



▲  Old National Bank Locations

☐  Marion County

**Percent Black Population**

☐ 0-25%

☐ 25-50%

☐ 50-80%

☐ 80-100%

51.     Today, Old National has no branches in census tracts that are more than 50%

Black and only two in census tracts that are more than 25% Black. In fact, it has just four

branches in the MSA located in census tracts where more than 10% of the residents are Black.

52.     Viewed at the level of census block groups (which are smaller than census tracts),

the failure to maintain branches serving Black residents is even more stark. Only two of Old

National's branches are located in census block groups where the proportion of residents who are

Black exceeds 10%.[6]

53.     The map on the following page shows the location of Old National's branches in

the Indianapolis MSA today.

---

[6] An additional two branches were located in block groups for which block-group level
demographic data were unavailable; however both are located in census tracts that are less than
6% Black.



**2021 Old National Bank Locations**

**Legend**

 Branch Location



54.     By placing its branches – the physical locations where it meets customers face to face, establishes a visible presence in a community, and markets its credit and deposit products, including mortgages – in areas with only a small proportion of Black residents, Old National actively discourages Black prospective customers from applying for loans and fails to provide them with an equal opportunity to seek and obtain mortgage credit.

55.     Furthermore, by disproportionately closing branches that are in or near Black neighborhoods, Old National has demonstrated its preference for white customers over Black customers.

**D.     Old National Has Located Its Non-Branch Lending Operations in Predominantly White Areas**

56.     In addition to its full-service branches, Old National operates other physical locations in the Indianapolis MSA that house much of its mortgage lending activities.

57.     Like its branches, Old National's lending operations are also located away from the parts of the MSA with a higher proportion of Black residents.

58.     Old National currently operates one Loan Production Office in the Indianapolis MSA, at 7517 Beechwood Road in Avon, Indiana. The Loan Production Office is located in a census tract where more than 80% of the residents are white, and approximately 4% are Black.

59.     Old National currently employs seven Mortgage Loan Officers ("MLOs") in its Central Indiana region, which includes the Indianapolis MSA. There are an additional eight MLOs from Old National's other regions located in areas close to the Indianapolis MSA. Six of the fifteen MLOs are within the Indianapolis MSA. All are located in predominantly white areas—areas where 75% or more of the population is white.

60.     The map on the following page shows the racially disparate locations of Old National's lending operations in the Indianapolis MSA and immediately surrounding area.



2021 Old National Lending Operation Locations

61.     Four Mortgage Loan Officers are located within Marion County, where the vast majority of the region's Black residents live. All four of the Mortgage Loan Officers located within Marion County work at the same location, located at 900 E 96th Street. East 96th Street forms the border between Indianapolis/Marion County and Hamilton County to its north. Thus, the only MLOs in Indianapolis are located at the far edge of the city away from the neighborhoods where more of the Black residents live.

62.     The two MLOs in parts of the Indianapolis MSA outside of Marion County work out of full-service bank branches located in Noblesville, Indiana and Carmel, Indiana. The census tracts in which the Noblesville and Carmel branches are located are 85% white and 6% Black, and 75% white and 4% Black, respectively.

63.     The location at 900 E 96th St where the four Indianapolis-based MLOs work is not a full-service bank branch. It is the location of Old National's Wealth Management office. Wealth Management services are designed to meet the needs of affluent individuals.

64.     The census tract in which the Wealth Management office is located is approximately 80% white and 2% Black.

65.     Old National publishes photographs of its MLOs on its website. Upon information and belief, based on a review of the photographs, all but one of the MLOs in the Central Indiana region are white, and none are Black. Across its entire range of operations, only one out of the eighty-five MLOs identified on Old National's website appears to be Black. Additionally, none of the nine management-level mortgage lending employees identified on its website appear to be Black.

66.     By placing its Mortgage Loan Officers and Loan Processing Office in predominantly white areas, and by not placing *any* loan officers in bank branches within

Indianapolis, where the vast majority of Black residents in the area live, Old National actively discourages Black prospective customers from applying for loans and fails to provide them with an equal opportunity to seek and obtain mortgage credit

> **E.    The Location of Old National's Lending Activity Demonstrates That It Is Engaged in Redlining**

67.    Pursuant to the federal Home Mortgage Disclosure Act ("HMDA"), each year Old National and its competitors must publicly report loan-level data about the mortgage applications they receive and the mortgage loans they originate, including information about borrowers' and applicants' location, race and ethnicity.

68.    Analysis of HMDA data regarding Defendant's mortgage applications and loans shows that Old National denies opportunities to potential Black customers. As intended by Old National, its policies and practices directed at prospective applicants, including but not limited to its selection of branch and MLO locations, discourage Black residents in the Indianapolis MSA from seeking mortgage credit and prevents them from obtaining it.

69.    Data regarding Defendant's competitors' applications and loans demonstrates that there is a demand for mortgage credit in the Indianapolis MSA's many minority neighborhoods and that there are qualified borrowers in those neighborhoods. The stark disparities between the records of Old National and its competitors confirm that there is no legitimate, non-discriminatory reason for Defendant's failure to make mortgage loans to Black residents and in minority neighborhoods.

> *i.    Old National's Poor Record of Lending to Black Borrowers*

70.    In 2019 and 2020, Old National made just thirty-seven mortgage loans to Black borrowers in the Indianapolis MSA. It made a total of 2,274 mortgage loans over the same time period; 1,898 of the loans were to white borrowers.

71.     Overall, across the MSA, just 1.878% of Defendant's loans where the race of the borrower was known were to Black borrowers. The MSA is 15% Black.

| Indianapolis MSA 2019 to 2020 | Count | Percent of Known-Race Originations |
|---|---|---|
| All Originations | 2274 | |
| Known-Race Originations | 2075 | |
| Originations to Black Borrowers | 37 | 1.78% |
| Originations to White Borrowers | 1898 | 91.47% |

72.     Similarly, in 2019-2020, Old National made just thirty-seven loans to Black borrowers in its Indianapolis assessment area— the area it has self-designated, pursuant to the federal Community Reinvestment Act and its enabling regulations, as containing the communities it serves. It made a total of 2,120 mortgage loans in the assessment area over the same time period; 1,759 of those loans were to white borrowers.

73.     Just 1.91% of Old National's loans in its Indianapolis assessment area where the race of the borrower was known were to Black borrowers.

| Indianapolis Assessment Area 2019 to 2020 | Count | Percent of Known-Race Originations |
|---|---|---|
| All Originations | 2120 | |
| Known-Race Originations | 1934 | |
| Originations to Black Borrowers | 37 | 1.91% |
| Originations to White Borrowers | 1759 | 90.95% |

74.     In Marion County, home to over 263,000 Black residents, Old National made only twenty-three loans to Black borrowers during the two-year period, out of 678 total loans and 596 known-race loans. In 2019, it made just eight loans to Black borrowers throughout all of Marion County.

75.     That is, in a county where over 27% of the population is Black, under 3.86% of Defendant's loans where the race of the borrower was known went to Black borrowers in 2019-2020:

| Marion County 2019 to 2020 | Count | Percent of Known-Race Originations |
|---|---|---|
| All Originations | 678 | |
| Known-Race Originations | 596 | |
| Originations to Black Borrowers | 23 | 3.86% |
| Originations to White Borrowers | 530 | 88.93% |

76.     The maps on the following two pages reflect the mortgage originations by Old National. The first shows loans to Black borrowers, and the second shows loans to white borrowers. Each dot represents a mortgage loan made by Old National, and the underlying color represents the minority concentration of each census tract.

77.     The maps show that Defendant made few loans to Black borrowers. Defendant made many more loans to white borrowers, and those loans are densely concentrated in the yellow tracts representing areas where 0-25% of the population is Black. There are also many loans to white borrowers in the green 25-50% Black tracts. Yet there are few loans in the blue tracts representing areas where the 50-80% or 80-100% of the population is Black.

### 2019-2020 Old National Originations to Black Borrowers in Marion County



**Legend**
- • 1 dot = 1 origination
- ▭ Marion County

**Percent Black Population**
- 0-25%
- 25-50%
- 50-80%
- 80-100%

**2019-2020 Old National Originations to White Borrowers in Marion County**



**Legend**



- • 1 dot = 1 origination
- ▢ Marion County

**Percent Black Population**
- 0-25%
- 25-50%
- 50-80%
- 80-100%

78.     As shown in these maps, Defendant's neglect of Black residents is further demonstrated by the fact that, when it does make loans in areas with meaningful Black populations, its customers are disproportionately white. Only 4.2% of its loans in census tracts with a population that was 25-50% Black went to Black borrowers. Similarly, only 18.8% of loans in 50-80% Black census tracts went to Black borrowers, and none of its loans in tracts that are over 80% Black. By contrast, 17.7% of all lenders' loans in census tracts with a population that was 25-50% Black went to Black borrowers; 32.73% of all lenders' loans in 50-80% Black census tracts; and 39.3% of loans in 80-100% Black census tracts. Among Defendant's four peer institutions, 16.6% of loans in census tracts that were 25-50% Black went to Black borrowers; 42.0% in 50-80% Black census tracts; and 46.3% in 80-100% Black census tracts.

### ii.     *Peer Institutions' Much Better Record of Lending to Black Borrowers*

79.     Old National's peer lenders in the MSA are much more successful at reaching Black borrowers in the neighborhoods that Old National ignores. For these analyses, Old National's peers are four of the five lenders that were within 50% to 200% of Old National's application and origination volume for each year from 2018 to 2020, in both Indiana as a whole and the Indianapolis MSA, excluding online-only lenders and credit unions. The fifth was removed from the peer group because it was the subject of a recent settlement with the United States over allegations of mortgage redlining of Black neighborhoods in Indianapolis, indicating that it is not an appropriate comparator.

80.     Old National's peer lenders did a substantially better job at serving the credit needs of Black residents. In the aggregate, the four peer institutions made 410 loans to Black borrowers in the Indianapolis MSA in 2019 and 2020, compared to Old National's thirty-seven loans.

81.     Overall, these lenders made 6.45% of their loans in the MSA to Black borrowers in 2019-2020. Their proportion of loans to Black borrowers is 3.62 times greater than that of Old National. In Marion County, the four peer institutions made 14.73% of their loans to Black borrowers, a proportion that is 3.82 times greater than that of Old National. And in Old National's Indianapolis Assessment Area, the peer institutions made 7.14% of their loans to Black borrowers, a proportion that is 3.73 times greater than that of Old National.

82.     The following chart summarizes the comparison between Old National and its peers with regards to mortgage loan originations to Black customers in 2019-2020.

| Comparison of Originations, Old National vs. Peer Institutions, 2019-2020 | |
| --- | --- |
| **Indianapolis Assessment Area** | |
| Proportion of Old National Originations Made to Black Customers | 1.91% |
| Proportion of Peer Originations Made to Black Customers | 7.14% |
| Peer Ratio: | 3.73 |
| **Indianapolis MSA** | |
| Proportion of Old National Originations Made to Black Customers | 1.78% |
| Proportion of Peer Originations Made to Black Customers | 6.45% |
| Peer Ratio: | 3.62 |
| **Marion County** | |
| Proportion of Old National Originations Made to Black Customers | 3.86% |
| Proportion of Peer Originations Made to Black Customers | 14.73% |
| Peer Ratio: | 3.82 |

83.     The much more equal distribution of loans by Old National's peer institutions is reflected on the maps on the following two pages. Compared to Old National, they made a greater portion of their loans to Black borrowers and in predominantly Black neighborhoods.



## 2019-2020 Peer Loans to Black Borrowers in Marion County



# 2019-2020 Peer Loans to White Borrowers in Marion County



**Legend**



- 1 dot = 1 loan
- Marion County

**Percent Black Population**

- 0-25%
- 25-50%
- 50-80%
- 80-100%

84.     In addition, the loans made in Black neighborhoods by the peer lenders are much more frequently to Black borrowers:

|  | % of First Lien Loans to Black Borrowers | |
| --- | --- | --- |
| **Census Tract % Black Population** | **Old National** | **Peer Lenders** |
| **25-50%** | 4.2% | 16.6% |
| **50-80%** | 18.8% | 42.0% |
| **80-100%** | 0.0% | 46.3% |

85.     Overall, 42.5% of the peer lenders' borrowers in majority-Black census tracts are Black (compared to 17.6% for Old National).

### iii.    *Old National's Poor Performance Is Confirmed By Comparing it to All Lenders in the Market*

86.     The four peer institutions discussed above are particularly appropriate comparators because of their similarity to Old National in terms of loan volume and business model. However, Old National also performs just as poorly in lending to Black borrowers when compared <u>all</u> other lenders covered by HMDA in the Indianapolis area.

87.     Combined, all lenders in the Indianapolis MSA made 205,682 residential mortgage loans in 2019-2020. They made 6.39% of these loans to Black borrowers. That is a proportion 3.58 times greater than the proportion of Old National's loans that went to Black borrowers. In Marion County, all lenders combined made 13.03% of their loans to Black borrowers, a proportion 3.38 times greater than the proportion of Old National's loans that went to Black borrowers. And in Old National's Indianapolis Assessment Area, all lenders made

6.95% of their loans to Black borrowers, a proportion 3.63 times greater than that of Old National.

88.    The following chart summarizes the comparison between Old National and all other lenders in the Indianapolis area with regards to mortgage loan originations to Black customers in 2019-2020.

| Comparison of Originations, Old National vs. All Lenders, 2019-2020 | |
|---|---|
| Indianapolis Assessment Area | |
| Proportion of Old National Originations Made to Black Customers | 1.91% |
| Proportion of All Lenders' Originations Made to Black Customers | 6.95% |
| Peer Ratio: | 3.63 |
| Indianapolis MSA | |
| Proportion of Old National Originations Made to Black Customers | 1.78% |
| Proportion of All Lenders' Originations Made to Black Customers | 6.39% |
| Peer Ratio: | 3.58 |
| Marion County | |
| Proportion of Old National Originations Made to Black Customers | 3.86% |
| Proportion of All Lenders' Originations Made to Black Customers | 13.03% |
| Peer Ratio: | 3.38 |

89.    Whether comparing to the entire market, or to a select group of lenders with similar business models and operations, Old National's mortgage loan originations to Black borrowers fall far short of those of other institutions. Across all categories observed, Black borrowers constituted more than three times as large a proportion of other lenders' mortgage originations than Old National's.

90.    Similarly, comparing Old National's performance to a larger number of approximately thirty-five to forty-five peers each year further demonstrates Old National's consistent and deteriorating record of failing to serve Black customers. These peers were also selected based on having 50% to 200% of Old National's loan volume, but for each individual

year and only for Marion County. The following chart reflects Old National's poor performance compared to these peers.



### iv.   As With Originations, Old National Obtains Far Fewer Applications from Black Customers Than Its Peers

91.   The same pattern of discrimination holds true for mortgage loan applications. In 2019 and 2020, Old National received only eighty applications from Black customers in the MSA, only seventy-nine in the assessment area, and only fifty-five in Marion County.

92.   Just 2.69% of Defendant's mortgage applications in the Indianapolis MSA came from Black applicants. In the assessment area, just 3.13% of its applications came from Black applicants. In Marion County, only 6.16% of its applications were from Black applicants.

93.   The maps on the following two pages reflect Old National's mortgage applications in Marion County from Black applicants and from white applicants. As with originations, applications received by Old National are overwhelmingly from white applicants and concentrated in white areas.



2019-2020 Old National Applications to Black Borrowers in Marion County

**Legend**
- 1 dot = 1 application
- Marion County

**Percent Black Population**
- 0-25%
- 25-50%
- 50-80%
- 80-100%



2019-2020 Old National Applications to White Borrowers in Marion County

94.     Like its loan originations, the applicants that Old National reaches in majority-Black areas are disproportionately white. Specifically, only 27.7% of Old National's applicants from majority-Black census tracts in Marion County are Black, while 44.05% of the peer lenders' applicants from these areas were Black.

95.     Comparison to either the four peer institutions, or to all lenders in the assessment area, further demonstrates the extent of racial discrimination by Old National. Combined, Old National's peer institutions received 7.84% of their applications in the Indianapolis assessment area from Black customers, over two and a half times the percentage for Old National.

96.     Likewise, all other lenders in the Indianapolis assessment area received 8.45% of their applications in the MSA from Black customers, nearly three times the percentage for Old National.

97.     The following two tables summarize the comparison between Old National and peer institutions, and between Old National and all other lenders in the Indianapolis area, with regards to mortgage loan applications from Black customers in 2019-2020.

| Comparison of Applications, Old National vs. Peer Institutions, 2019-2020 | |
| --- | --- |
| Indianapolis Assessment Area | |
| Proportion of Old National Applications Received from Black Customers | 2.86% |
| Proportion of Peer Applications Received from Black Customers | 7.84% |
| Peer Ratio: | 2.74 |
| Indianapolis MSA | |
| Proportion of Old National Applications Received from Black Customers | 2.69% |
| Proportion of Peer Applications Received from Black Customers | 7.02% |
| Peer Ratio: | 2.62 |
| Marion County | |
| Proportion of Old National Applications Received from Black Customers | 6.16% |
| Proportion of Peer Applications Received from Black Customers | 16.30% |
| Peer Ratio: | 2.65 |

| Comparison of Applications, Old National vs. All Lenders, 2019-2020 | |
|---|---|
| **Indianapolis Assessment Area** | |
| Proportion of Old National Applications Received from Black Customers | 2.86% |
| Proportion of All Lender Applications Received from Black Customers | 8.45% |
| All Lender Ratio: | 2.96 |
| **Indianapolis MSA** | |
| Proportion of Old National Applications Received from Black Customers | 2.69% |
| Proportion of All Lender Applications Received from Black Customers | 7.72% |
| All Lender Ratio: | 2.87 |
| **Marion County** | |
| Proportion of Old National Applications Received from Black Customers | 6.16% |
| Proportion of All Lender Applications Received from Black Customers | 15.53% |
| All Lender Ratio: | 2.52 |

98.     The applications received by Old National's peer institutions in Marion County are mapped on the following two pages. The maps confirm that the peer institutions have a much higher distribution of applications in Black neighborhoods, from both Black and white borrowers, than Defendant.



**2019-2020 Peer Applications from Black Borrowers in Marion County**

Legend

- 1 dot = 1 application
- ▭ Marion County

**Percent Black Population**
- 0-25%
- 25-50%
- 50-80%
- 80-100%



**2019-2020 Peer Applications from White Borrowers in Marion County**

**Legend**
- 1 dot = 1 application
- Marion County

**Percent Black Population**
- 0-25%
- 25-50%
- 50-80%
- 80-100%

99.     The comparison to the larger group of thirty-five to forty-five peers likewise shows Old National's poor performance with regards to applications from Black customers. This pattern is reflected in the following chart.



F.     **Defendant's Failure to Reach Black Potential Customers Is Not Attributable to Its Product Mix or Other External Factors**

100.     Old National's racially disparate pattern of mortgage lending, evidenced by the maps and data set forth above, is not the result of a limited product mix or other external factors.

101.     Old National offers federally insured loans under the Federal Housing Administration ("FHA"), Veterans Administration and Department of Agriculture programs. In addition, it offers its own FHA-alternative loan product called Home Manager Mortgage, which it touts as superior to FHA loans for borrowers within the target market for FHA loans. Like FHA loans, the Home Manager mortgage permits down payments as low as 3%, but unlike FHA loans, it does not require payment of a mortgage insurance premium.

102.     These programs are designed to meet the needs of low- and moderate-income borrowers. Accordingly, Old National has loan products that are well suited to the needs of borrowers across the economic spectrum, including those in underserved communities.

103.     If Old National only made conventional loans and not any loans under government programs, that might help explain the markedly superior market performance of peer lenders, but that is not the case. Like the other top lenders in the Indianapolis MSA generally, Old National offers products that are suitable for all kinds of customers.

104.     Nor can Defendant's lending patterns be explained by other socioeconomic factors, such as any purported lack of qualified Black borrowers. If such factors were the cause of the disparities, the statistics regarding other lenders in the area would be similar to those for Old National because the other lenders are getting applications and making similar loans in the same market. Yet Defendants' peers far exceed its performance in reaching and making loans to Black customers in the Indianapolis area.

105.     The data reveal, accordingly, that Defendant's racially disparate pattern of lending is the result of its own decision making, i.e., a decision to avoid the Indianapolis region's Black residents and majority-Black neighborhoods and to concentrate its efforts with white residents and in white neighborhoods. Simply put, the data show that the large racial disparities in Defendant's lending activity are the result of redlining and are not the result of other factors.

106.     Old National's poor record with its Home Manager Mortgage is emblematic. While Old National has pointed to this product as one that is particularly advantageous for low to moderate income borrowers and people otherwise likely to obtain FHA loans—a population that is disproportionately Black—it has been unable or unwilling to translate this product availability

into actual lending activity. In fact, Old National made only 42 of these loans to people of any race in the three-year period from 2016 to 2018[7] across its entire multistate operations.

### G. Old National Has Failed to Take Meaningful Steps to Conduct Outreach and Marketing to Black Residents and in Predominantly Black Neighborhoods

107.   Old National has failed to take meaningful steps to conduct outreach and marketing to Black residents and in predominantly Black communities.

108.   As described in section C above, Old National reduced its branch presence in census tracts with significant Black populations.

109.   Having branch locations in a community is a key way for banks to develop a presence in the community and market its products and services, including mortgage loans.

110.   As described in section D above, Old National failed to station Mortgage Loan Officers in bank branches in Black census tracts. Instead, it stationed its Mortgage Loan Officers either in bank branches in outlying communities with predominantly white populations or in a location at the border between Marion and Hamilton Counties designed to serve the banking needs of affluent individuals.

111.   Defendant has failed to develop partnerships with key community organizations that could help it connect to Black borrowers.

112.   Old National has been significantly less active in partnering with community organizations working in Black neighborhoods and with potential Black borrowers than many other lenders in the Indianapolis area, such as by participating in homebuyer education classes or other events aimed at Black homebuyers.

---

[7] This information comes the public portion of Old National's most recently released CRA performance evaluation and is the most recent available for the Home Manager Mortgage product.

113.     Upon information and belief, Old National's failure to develop an active and visible lending presence in Black communities reflects its intention to exclude Black borrowers from its mortgage lending programs.

###### H.     Tests Conducted by the FHCCI at Old National Branches

114.     To investigate and evaluate Defendant's lending practices, Plaintiff the FHCCI conducted two "matched-pair" tests in 2021. In-person and phone testing at Old National branches in the Indianapolis MSA confirms the pattern of redlining revealed by the evidence set out above, and provides further evidence of racially discriminatory intent by Old National. The tests demonstrate a pattern of discouraging Black testers and providing them inferior treatment and service in comparison with similarly situated white testers.

115.     In each test, two testers were similarly situated except that one was white and one was Black. The testers all received the same instructions in both tests, and all four testers visited Old National branches for the same purpose: to obtain information about residential mortgage loans for a home purchase in the Indianapolis MSA. All four testers were assigned similar credentials that made them qualified to purchase homes in the same price range, except that the Black testers were given slightly better credentials.

116.     Defendant's loan officers provided Black testers with less information than they provided to the white testers, took them less seriously, and steered one of the testers towards more costly low down payment mortgages. Old National loan officers provided the white testers with helpful, detailed product comparisons and analyses of their finances, additional information about loan options, and more meaningful follow-up contact. The loan officers did not provide these benefits to the Black testers. In both tests, the differential treatment was consistent with Old National's practice of discouraging Black individuals from seeking loans.

**Test 1**

117.     In the first test, testers went to the South Rangeline Road branch of Old National in Carmel, Indiana. The South Rangeline Road branch is one of the two full-service branches in the Indianapolis MSA listed as having an onsite mortgage loan officer on Old National's website. The Black tester and the white tester visited the branch approximately ten days apart. The two testers had conversations with different on-site non-MLO employees, and then met by phone with the same Old National loan officer.

118.     The loan officer requested more specific information from the white tester and used that additional information to offer more customized advice. Specifically, the loan officer asked the white tester for information about the employment history, occupation, and income of the tester and her spouse, as well as their monthly bills and other debts. The loan officer used this information to calculate the tester's projected debt-to-income ratios, the home prices she would qualify for, and her projected monthly payment. The loan officer did not request any of this information from the Black tester, and did not calculate her debt-to-income ratios or the size of loan she could obtain and did not discuss with her the estimated monthly payment.

119.     The loan officer told both testers that they would qualify for a thirty-year fixed rate mortgage, but also informed the white tester that she could opt for a shorter term loan and that there would be no prepayment penalties for paying off the loan sooner. He did not provide the Black tester with this additional information.

120.     The loan officer provided specific advice to the white tester, but provided the Black tester with less helpful, more general information.

**Test 2**

121.    The second matched pair test was conducted at the West Southport Road branch in Indianapolis and by phone. The two testers met with different on-site non-lending bank employees and then spoke by phone to the same loan officer. The tests occurred approximately three weeks apart.

122.    The loan officer provided the white tester with an estimate of the monthly mortgage payment, including detailed information about principal, interest, and insurance, but did not provide the same kind of estimate or information to the Black tester.

123.    The loan officer told the Black tester that there would be additional fees for the loan, and walked through a list of additional fees including bank origination fees, title company charges, appraisal fees, and closing costs. The loan officer did not discuss additional fees with the white tester.

124.    Both testers indicated that they were not yet working with a realtor. The loan officer advised both testers that the seller would pay for the realtor, but strongly encouraged the white tester to get a realtor to assist her through the process, while suggesting to the Black tester she could contact the listing agent on the sale sign of the house she was interested in because they work with both parties in the home sale.

125.    Although both testers had similar incomes and asked about qualifying for homes with similar purchase prices, the loan officer told the white tester that he would use a loan amount of $35,000 more than she had requested when entering the pre-approval information, just in case, so that she would know what she can afford. He did not offer to increase the loan amount for the Black tester in order to provide this additional useful information.

126.     The loan officer asked both testers about their available down payments, and both indicated that they planned to put 20% down.

127.     Although both borrowers said during the call that they would be putting 20% down, the loan officer's subsequent informational email to the Black tester did not reflect that plan. Instead, the email stated that she would need to pay a minimum of 5% down, or that she could do a 18% down payment with a small PMI. Both of these options would require paying PMI. In contrast, the loan officer's follow-up email to the white tester noted that since she was planning to put 20% down, she would not need to pay PMI. He mentioned that there was an option to put 18% down with a small PMI, but did not suggest that she put down less than 18%.

128.     The loan officer's follow up email to the white tester provided significantly more detailed information, resources, and tips than his follow up email to the Black tester. His email to the white tester included information about what lenders look for, closing costs and fees, prepayments, and the steps the tester should take next, as well as a breakdown of down payments and monthly mortgage payments for a home with a $300,000 purchase price. The email to the Black tester included, in addition to the down payment information, a link to the preapproval application—but did not provide the detailed information about what lenders look for, closing costs and fees, prepayments, and next steps that was provided to the white tester.

**<u>INJURY TO PLAINTIFF</u>**

129.     Plaintiff the FHCCI has suffered substantial, particularized, and concrete injuries as a direct result of Defendant's unlawful redlining in the Indianapolis MSA.

130.     The FHCCI's mission is to ensure that that people in Central Indiana have equal housing opportunities. It conducts fair housing investigations and advocates for individuals who have been victims of housing discrimination. It conducts educational programs and activities

including, but not limited to, trainings, conferences, publications, community events, and social media alerts. The FHCCI also works to increase the awareness of policymakers of fair housing issues by meeting with local, state, and federal officials to ensure strong fair housing laws and policies.

131.    The FHCCI learned that Old National was engaged in redlining in the course of its evaluation of mortgage lending in the Central Indiana region generally. As a result, the FHCCI launched an investigation into Old National to ascertain and evaluate the nature and extent of Defendant's unlawful lending activity. The FHCCI's investigation included, among other things, analysis of HMDA data and branch locations, investigation and review of Defendant's CRA evaluations and its Indianapolis MSA Assessment Area, and conducting the matched-pair tests described above.

132.    As a result of its findings, the FHCCI engaged in numerous activities to counteract the effects of redlining by Old National. The FHCCI developed and implemented trainings, which it presented to local real estate organizations and other stakeholders, and presented information about the redlining issue at fair housing conferences.

133.    All of these activities were designed to educate residents, organizations, and officials in the Indianapolis region about redlining, lending discrimination, and individuals' rights under the Fair Housing Act, and to combat the illegal lending practices identified by the FHCCI. Plaintiff engaged in these activities as a response to its findings about Old National and to reverse the harm inflicted on people in the Indianapolis region by Defendant's actions.

134.    The FHCCI also engaged in efforts to educate federal regulators about Old National's discriminatory practices and record so that the regulators would be fully aware of this information in connection with Old National's pending merger application, examinations of its

performance under the Community Reinvestment Act, and any fair lending examinations. The FHCCI would not have engaged in these educational activities if it had not first determined that Old National is engaged in redlining in the Indianapolis area.

135.    The FHCCI had to divert significant staff time and funds away from other planned activities to engage in these essential activities, for which it did not originally budget time or money, because its resources are limited. Counteracting unlawful redlining by Old National prevented the FHCCI from engaging in other activities that are important to its mission. For example, the FHCCI was forced to forego activities related to its eviction prevention project and its efforts to combat predatory lending in Central Indiana, and divert time and resources from working on fair housing advancements through public policy efforts and conducting expanded investigations into insurance and sales discrimination. The Old National investigation and counteraction also prevented the FHCCI from conducting additional consulting and training of housing providers, applying for new grants and funding sources, attending conferences, and professional staff development.

136.    Defendant's redlining in the Indianapolis MSA directly contradicts and frustrates the FHCCI's mission. As described in greater detail above, the FHCCI's mission is to ensure fair and equal housing opportunities for all and in all neighborhoods, and to fight unlawful discrimination. Redlining in the Indianapolis region directly impedes the FHCCI's efforts and frustrates its mission. It does so by denying equal housing opportunities; undermining the FHCCI's education, advocacy, and training programs designed to promote fair housing and fair lending; and communicating that lenders can evade their legal obligation to treat all consumers and neighborhoods equally without regard to race.

137.     Unless enjoined, Old National will continue to engage in the unlawful conduct described herein and the FHCCI's injuries will increase because it will have to continue diverting resources to counteract Defendant's conduct.

138.     Old National has engaged in the discriminatory conduct described herein intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the rights of Plaintiff and the residents of the Indianapolis region.

139.     Defendant's policies and practices, including but not limited to the placement of its physical locations, its provision of fewer lending services to Black borrowers, and its discouragement of Black residents through differential treatment, are intended to deny and discourage, and have the effect of denying and discouraging, an equal opportunity to obtain mortgage loans to Black residents of the Indianapolis MSA. These policies and practices adversely affect Black residents, are not justified by any legitimate business need or necessity, and cause injury to the FHCCI.

## CAUSE OF ACTION

### Violation of the Fair Housing Act,
### 42 U.S.C. § 3601 *et seq.*

140.     Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 139 as if fully set forth herein.

141.     Defendant's acts, policies, and practices constitute intentional discrimination on the basis of race. Defendant intentionally avoids lending to Black borrowers because of race, and intentionally focuses its business instead on white borrowers and in white neighborhoods.

142.     Defendant's acts, policies, and practices also have an adverse and disproportionate effect on Black residents of Marion County, Old National's local assessment area, and the Indianapolis-Carmel-Anderson, Indiana Metropolitan Statistical Area. This adverse

and disproportionate effect is the direct result of Defendant's policies of, *inter alia*, locating its branches where the white population is large and the Black population is small, and of only seeking to obtain applications from and make loans in certain parts of the MSA where the white population is large. These policies have discouraged Black residents from seeking mortgage credit, and have denied them an equal opportunity to obtain mortgage credit as is afforded to whites.

143.    Defendant's acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604 and 3605:

a.    Defendant's acts, policies, and practices have made and continue to make housing unavailable on the basis of race, in violation of 42 U.S.C. 3604(a);

b.    Defendant's acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of 42 U.S.C. § 3604(b);

c.    Defendant's acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

## <u>DEMAND FOR A JURY TRIAL</u>

144.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

145.    Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendant violate 42 U.S.C. §§ 3604 and 3605;

146.    Enter a permanent injunction enjoining Defendant and its directors, officers, agents, and employees from continuing to publish, implement, and enforce the illegal conduct described herein and directing Defendant and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of that conduct and to prevent additional instances of such conduct or similar conduct from occurring in the future;

147.    Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its injuries caused by the conduct of Defendant alleged herein;

148.    Award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendant for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

149.    Award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2);

150.    Order such other relief as this Court deems just and equitable.


Date: October 6, 2021

/s/ Russell B. Cate
/s/ Matthew B. Keyes
Russell B. Cate (Attorney No. 27056-29)
Matthew B. Keyes (Attorney No. 29315-49)
RileyCate, LLC
11 Municipal Drive Suite 320
Fishers, IN 46038
Tel: 317-588-2866
Fax: 317-564-0599
rcate@rileycate.com
mkeyes@rileycate.com

John Relman*
Glenn Schlactus*
Sara Pratt*
Alexa Milton*
RELMAN COLFAX PLLC
1225 19th St., NW
Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
jrelman@relmanlaw.com
gschlactus@relmanlaw.com
spratt@relmanlaw.com
amilton@relmanlaw.com

*Attorneys for Plaintiff Fair Housing Center of
Central Indiana, Inc.*

**Pro hac vice* applications to be filed